**E-FILED**
Monday, 09 September, 2013 12:50:24 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-20008 |
| | ) | |
| NOE SANCHEZ a.k.a. | ) | |
| EPIMENIO SANCHEZ GONZALES | ) | |
| and MANUEL GONZALEZ, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

SUE E. MYERSCOUGH, U.S. District Judge:

This cause is before the Court on Defendant Noe Sanchez's, a.k.a. Epimenio Sanchez Gonzales, Motion to Suppress Statements (d/e 20). Defendant's Motion is DENIED. The Government has demonstrated that Defendant knowingly, voluntarily, and intelligently waived his rights under Miranda. Miranda v. Arizona, 384 U.S. 436, 461, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

## I. BACKGROUND

Defendant and his nephew, co-defendant Manuel Gonzalez, have been indicted on charges of conspiring to manufacture and distribute marijuana, possession with intent to distribute marijuana, unlawful possession of a firearm by an illegal alien, and possession of a firearm in furtherance of a drug-trafficking crime. Defendant has also been charged with illegal re-entry into the United States following deportation.

On September 22, 2011, agents with the Kankakee County Major Crimes Task Force patrolled the area of 7752 South 17000 East Road, St. Anne, Illinois. Authorities had received an anonymous tip regarding marijuana plants being grown in the area. Agents Russ Belcher and Andy Mackin were greeted by co-defendant Manuel Gonzalez as the Agents approached the address.

The Agents advised co-defendant Gonzalez that they were looking for marijuana plants. Co-defendant Gonzalez consented to the Agents searching the property. Next to a shed that appeared to be the living quarters of Defendant and co-defendant Gonzalez, the Agents saw one marijuana plant. Approximately 50 to 75 yards from the shed, the

Agents observed numerous manmade, evenly spaced rows of marijuana plants. The plants had yellow plastic flowers attached to them. In all, the Agents recovered 2,253 marijuana plants from the field and located a loaded Browning BPS 10 gauge shotgun in the shed. At the scene, the Agents asked Defendant and co-defendant Gonzalez about the marijuana plants. Defendant and co-defendant Gonzalez denied any knowledge of the marijuana crop.

### A. Defendant Eventually Stated that He and Co-defendant Gonzalez Took Care of the Marijuana Field at 7752 South 17000 East Road, St. Anne, Illinois

Approximately four hours after Defendant had been taken to the Kankakee County Sheriff's Office, Agent Belcher interviewed Defendant, a Mexican National and 28 years old at the time. At the outset of the interview, Agent Belcher asked Defendant if he spoke English well enough to understand Agent Belcher. Defendant waved his hand back and forth and responded, "A little bit . . . I can understand a lot but, but more than I can speak." Sanchez Interview at 1:10. Agent Belcher told Defendant to "stop" Agent Belcher if Defendant had "any questions . . . at all" so Agent Belcher could "explain" the County's interview policy

and Defendant's rights. Sanchez Interview at 1:15. Defendant answered "Okay." Agent Belcher then said "Cuz I don't want you to, if I need to get a translator in here to help out, I'll do that." Sanchez Interview at 1:25. Again, Defendant answered "Okay."

Agent Belcher then asked Defendant his name, date of birth, address, and phone number. Defendant had difficulty spelling his name orally, but asked for a piece of paper and was able to write his name and date of birth. Sanchez Interview at 1:45, 2:11. Defendant stated that he cannot read English and that he attended school in Mexico until he was 15 years old. Sanchez Interview at 5:55, 6:05.

After these responses, Agent Belcher reviewed the Kankakee County Sheriff's Police Video/Audio Recorded Interview Consent form by reading the form aloud to Defendant. Agent Belcher asked Defendant if he understood what the consent form meant, and Defendant said "Yeah, you just, you gonna be like talking to me and at the same time taking my video and recording." Sanchez Interview at 7:50. Agent Belcher stated, "Exactly."

Agent Belcher subsequently administered the Miranda warnings by reading Kankakee County's Voluntary Statement form aloud to Defendant. Specifically, Agent Belcher advised Defendant of his right to remain silent. Agent Belcher asked Sanchez if he understood what that means. Sanchez answered "Yeah." Sanchez Interview at 9:20. Next, Agent Belcher advised Sanchez that anything he said could be used against him in a court or courts of law for the offense or offenses concerning which this statement is herein made. Agent Belcher asked Sanchez if he understood this right. This time, Sanchez responded with a "Mhmm." Sanchez Interview at 9:30. After Sanchez's response, Agent Belcher advised Defendant of his right to hire a lawyer or, if Defendant could not afford a lawyer, that Defendant could request and receive appointment of a lawyer without cost. Agent Belcher also told Defendant that he had the right to have an attorney present before and during the statement. Again, Agent Belcher asked Defendant if he understood these rights and Defendant said "Yeah." Sanchez Interview at 9:40, 9:50.

As stated, Agent Belcher asked Defendant if he understood each warning that Agent Belcher read aloud. Once Defendant had indicated he understood the warning, Agent Belcher had Defendant initial the Voluntary Statement form on a line next to the specific warning. After giving Defendant all of the Miranda warnings, Agent Belcher asked Defendant to sign the bottom of the Voluntary Statement form and Defendant did so.

Agent Belcher then began asking Defendant questions about the marijuana found at 7752 South 17000 East Road, St. Anne, Illinois. During this questioning, Defendant denied knowledge of or involvement with the growing of the marijuana. At one point, after Defendant continued to deny any knowledge of the marijuana field, Agent Belcher stated:

> Well, I'm telling you right now ok, listen to me. Manuel's done the right thing. Right now he's not going to the, to the jail. I can't say that for you. Because I got the pictures that says what you're gonna, it shows me what you're doing. And when you lie to me, that's kind of pissing me off right, I'm not here to be a bad guy, I'm sure not, but I'm just wanting you to be honest with me.

See d/e 37 at 34.

After about 40 minutes of questioning, Defendant finally admitted that he and co-defendant Gonzalez had started taking care of the marijuana plants approximately 4 to 5 months before the September 22, 2011 interview at the Kankakee County Sheriff's Office. Defendant stated that he and co-defendant Gonzalez would put fertilizer on the plants. Sanchez Interview at 1:00:40. Defendant also stated that the buds would turn brown in about 1 month and at that point the plants would be ready to harvest. Sanchez Interview at 42:25.

Agent Belcher further questioned Defendant about the flowers tied to the plants, the shotgun found in the shed, and how much money Defendant thought he and co-defendant Gonzalez would make for raising the marijuana crop. Defendant denied that he had tied flowers to the plants but agreed that the flowers were there to camouflage the plants from aerial surveillance. Sanchez Interview at 44:20. Defendant then stated that he had taken the shotgun into the field with him on more than one occasion and thought that he and co-defendant Gonzalez would each receive $5,000.00 as payment for taking care of the marijuana crop. Sanchez Interview at 48:30, 51:55.

Toward the end of the interview, Agent Belcher asked Defendant if he needed water. Defendant asked to use the restroom. Defendant used the restroom and got some water. Sanchez Interview at 54:00.

Defendant has filed the instant Motion to Suppress Statements that were (d/e 20) made to Agent Belcher during the interview.

**B. Defendant Sanchez Has Two Prior Felony Convictions in the United States and Has Spent Significant Time In the United States**

Defendant has two prior felony convictions in the United States for unlawful sex with a minor. The police reports from those convictions reveal that in 2008, Defendant was interviewed by police and advised of his rights under Miranda. The records further show that Defendant waived his rights under Miranda and spoke with officers about the prior crimes. Court records also show that Defendant had been living in the United States for 10 years prior to his 2009 convictions for unlawful sex with a minor, or since he was 14 years old.

**C. The Government Presented Witnesses that Gave Testimony Regarding Defendant's Two Prior Felony Convictions and the Discovery of the Marijuana Grow In St. Anne, Illinois**

On August 23, 2013, an evidentiary hearing was held on Defendant's Motion to Suppress Statements. Deputy Don Harmon and

Deputy Robin Gonzalez, both of the Yolo County California Sheriff's Department, testified that each had spoken with Defendant and advised him of his rights under Miranda during the investigations of Defendant's two prior felony convictions for unlawful sex with a minor. Deputies Harmon and Gonzalez stated that they had admonished Defendant of his rights under Miranda in English and that neither Deputy speaks Spanish.

Furthermore, the Deputies testified that Defendant exhibited an understanding of English during the interviews. Deputy Harmon specifically recalled Defendant giving details about his sexual contact with the minor including that Defendant had used a condom because the minor was not on birth control. Defendant also admitted to Deputy Harmon that Defendant knew his conduct was inappropriate. Deputy Gonzalez testified that she and Defendant spoke for about forty-five minutes, and, that during the interview, Defendant articulated that a restraining order had been issued for Defendant to refrain from contacting the minor, that Defendant realized he was violating that

order, and that Defendant was willing to break the law because he loved the minor.

Yolo County has a significant Hispanic population and the Sheriff's Department has Spanish speakers on staff. However, at no time during the interviews did Deputies Harmon or Gonzalez believe Defendant required a Spanish interpreter to understand his rights under Miranda or a conversation in English.

Also during the evidentiary hearing, the Government presented testimony from Agent Belcher and Agent Mackin. The agents testified to, among other things, their discovery of the marijuana field. Agent Belcher also elaborated on his interview of Defendant at the Kankakee County Sheriff's Office.

## II. LEGAL STANDARD

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

In Miranda, the Supreme Court concluded that, without proper safeguards, the process of in-custody interrogation of persons suspected

or accused of a crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. Miranda, 384 U.S. at 469. Consequently, the Court formulated the Miranda warnings to assure that the individual's right to choose between silence and speech remains intact throughout the interrogation process. Id. Therefore, before custodial interrogation, police must warn an individual that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has the right to the presence of an attorney, retained or appointed. Id. at 444.

A valid Miranda waiver must be intelligent, knowing, and voluntary. Berghuis v. Thompkins, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). That is, the waiver must have been "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and the "totality of the circumstances surrounding the interrogation" must show that the defendant had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421, 106

S.Ct. 1135, 89 L.Ed.2d 410 (1986), accord, Colorado v. Spring, 479 U.S. 564, 573-74, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987). The burden is on the Government to demonstrate by a preponderance of the evidence that the individual knowingly, voluntarily, and intelligently waived his rights under Miranda. Colorado v. Connelly, 479 U.S. 157, 168, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

## III. ANALYSIS

In this case, Defendant argues that he did not knowingly, voluntarily, and intelligently waive his rights under Miranda. Specifically, Defendant contends that he was subjected to the abusive police practice of failing to ensure that Defendant understood his rights, given his limited English skills. Defendant also argues that, even absent an abusive police practice, the Government cannot establish that Defendant's waiver was knowing and intelligent given his limited English language skills and cultural background.

### A. Defendant Voluntarily Waived His Rights Under Miranda Because He Was Not Subjected to Abusive Police Practices

Defendant argues first that despite Defendant's deficient English skills, Agent Belcher did not provide a Spanish translation of Defendant's

rights under Miranda, did not provide an interpreter for Defendant, and failed to ensure that Defendant understood his rights under Miranda. Defendant asserts that Agent Belcher's failure to provide either an interpreter or a Spanish translation of the Miranda warnings constituted an abusive police practice that rendered Defendant's waiver involuntary.

The abusive police practices Defendant alleges occurred are the types of acts that the constitutional principles underlying Miranda seek to curb. Rice v. Cooper, 148 F.3d 747, 750 (7th Cir. 1998). If it is apparent to police that a defendant cannot speak English, attempting to extract a waiver of his rights under Miranda is obviously an abusive police practice that would render a waiver involuntary. Id. (giving examples of abusive police practices but affirming district court's decision that 16-year-old mentally retarded defendant waived his rights under Miranda because the police believed the defendant understood the explanation of his rights).

Here, Agent Belcher began the more than one hour long conversation with Defendant by asking Defendant if he spoke English well enough to understand Agent Belcher. Defendant waved his hand

back and forth and responded, "A little bit . . . I can understand a lot but, but more than I can speak." Sanchez Interview at 1:10. Agent Belcher told Defendant to "stop" Agent Belcher if Defendant had "any questions . . . at all" so Agent Belcher could "explain" the County's interview policy and Defendant's rights. Sanchez Interview at 1:15. Sanchez answered "Okay." Agent Belcher then said "Cuz I don't want you to, if I need to get a translator in here to help out, I'll do that." Sanchez Interview at 1:25. Again, Defendant answered "Okay."

Agent Belcher also reviewed the Kankakee County consent form for video recorded interviews by reading the form aloud to Defendant. Agent Belcher asked Defendant if he understood what the consent form meant, and Sanchez said "Yeah, you just, you gonna be like talking to me and at the same time taking my video and recording." Sanchez Interview at 7:50. Agent Belcher stated, "Exactly."

During their conversation, Agent Belcher also asked Defendant questions about the property at 7752 South 17000 East Road, St. Anne, Illinois, the marijuana being grown on that property, the shed on the property, the yellow flowers tied to the marijuana plants, and a 10 gauge

Browning shotgun found in the shed. After each question, Defendant gave a response that correctly addressed each question.

Because Defendant accurately and adequately addressed all of Agent Belcher's questions that were posed in English, Agent Belcher had no reason to think that Defendant could not understand English. Consequently, Agent Belcher did not engage in the abusive police practice of trying to extract a Miranda waiver from an individual that Agent Belcher clearly knew could not understand or speak English.

### B. Defendant Has the English Skills and Understanding of United States Law to Have Knowingly and Intelligently Waived His Rights Under Miranda

Defendant also argues that, even if his waiver was not a product of abusive police practices, the waiver was not knowing and intelligent. Defendant contends that he only understands conversational English and that his cultural background limits his ability to truly understand the archaic Miranda warnings that Agent Belcher administered during the interrogation.

### 1. Defendant Understands English Well Enough to Have Knowingly and Intelligently Waived His Rights Under Miranda

Generally, a defendant's waiver is knowing and intelligent if he understands that he can refuse to talk to people asking him questions or stop the questioning altogether. Collins v. Gaetz, 612 F.3d 574, 588 (7th Cir. 2010). "It is only when the evidence in the case shows that the defendant could not comprehend even the most basic concepts underlying the Miranda warnings that the courts have found an unintelligent waiver." Id. An example of this would be where the defendant has such a poor understanding of English that he clearly cannot understand what the officer has said. Id. (citing United States v. Alarcon, 95 Fed.Appx. 954, 955-57 (10th Cir. 2004) (noting that the defendant understood only "bits and pieces" of English and often pretended to understand English out of embarrassment and a desire to cooperate)); United States v. Garibay, 143 F.3d 534, 537-38 (9th Cir. 1998) (finding no evidence that the defendant spoke enough English to understand warnings, and several witnesses testified that he spoke only a few words of English).

In this case, however, the conversation between Defendant and Agent Belcher demonstrates that Sanchez understood the Miranda warnings administered by Agent Belcher.

Furthermore, Deputies Harmon and Gonzalez of the Yolo County Sheriff's Department testified that each had administered Miranda warnings and interviewed Defendant during the investigation of Defendant's prior felony convictions for unlawful sex with a minor. Yolo County has a significant Hispanic population and the Sheriff's Department has Spanish speaking staff on hand. Despite having Spanish speaking staff, neither Deputy believed Defendant required an interpreter to understand his rights under Miranda or the interviews conducted entirely in English. The Deputies also recalled Defendant's ability to articulate facts about the crimes he had committed, that he understood his actions were wrong, and that legal action had already been taken to prevent Defendant from contacting the minor.

### 2. Defendant's Cultural Background Did Not Preclude a Knowing and Intelligent Waiver of His Rights Under Miranda

Defendant also states that he is a native of Michoacan, Mexico. Attached to the instant Motion is a scholarly article that discusses the culture of corruption and violence that accompanies police interactions in Michoacan, Mexico. Rodrigo Murataya, Power With Impunity: Michoacan, Mexico, 1 Int'l J. of Humanities and Social Science no. 16, pp. 84-90 (Nov. 2011), http://www.ijhssnet.com/journals/Vol_1_No_16_November_2011/11.pdf. Defendant contends that his interactions with the police environment in Mexico have colored his perception of law enforcement so he "had no reason to believe that his rights would be honored." See d/e 20 at 10.

Defendant correctly notes that his cultural background is a factor that could show he did not knowingly and intelligently waive his rights under Miranda. Fare v. Michael C., 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979) (considering the totality of the circumstances including "age, experience, education, background and

intelligence" to determine whether a juvenile knowingly and intelligently waived his rights under Miranda).

However, Defendant's cultural background does little to show that he did not understand the Miranda warnings because Defendant has spent significant time in the United States and has two prior felony convictions in the United States. Police reports from these prior contacts with United States law enforcement officials reveal that, in 2008, Defendant was interviewed, advised of his rights under Miranda, waived his rights, and spoke to officers about his involvement in criminal activity. Court records from Defendant's cases also show that he had been living in the United States for 10 years prior to his 2009 conviction.

Clearly, Defendant's cultural background includes a substantial portion of time spent in the United States and prior contact with the United States justice system. Further, he has demonstrated an understanding of English in his interviews with Yolo County Deputies Harmon and Gonzalez and in the interview with Agent Belcher. Therefore, neither Defendant's cultural background nor his limited

English skills precluded him from knowingly and intelligently waiving his rights under Miranda.

## IV. CONCLUSION

The Government has presented evidence showing Defendant Sanchez knowingly, voluntarily, and intelligently waived his rights under Miranda. Therefore, Defendant Sanchez's Motion to Suppress (d/e 20) is DENIED.

IT IS SO ORDERED.

ENTER: September 6, 2013

FOR THE COURT: s/ Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE